[Cite as *Triplett v. Ohio State Univ. Med. Ctr.*, 2011-Ohio-5994.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JOYCE TRIPLETT,

    Plaintiff,

    v.

THE OHIO STATE UNIVERSITY
  MEDICAL CENTER,

    Defendant.

Case No. 2009-03991

Judge Alan C. Travis

DECISION

{¶1} Plaintiff brought this action alleging medical negligence. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} On January 16, 2008, plaintiff presented to defendant's emergency room with complaints of shortness of breath.[1] Plaintiff was admitted and diagnosed with pneumonia and hypoxemia. Plaintiff was morbidly obese, weighing more than 500 pounds, with a history of obstructive sleep apnea and being bedridden. According to medical records, plaintiff had been discharged from an extended care facility ten days earlier, where she had been treated for a left foot ulcer which required intravenous antibiotic therapy.

{¶3} Upon admission, defendant's nursing staff conducted a "Braden Scale" assessment to determine whether plaintiff was at risk for skin breakdown. According to medical literature and defendant's policy guidelines, any patient who scores 18 or less on the Braden Scale is at risk for skin breakdown. Plaintiff's score was 14. When she was examined, it was noted that plaintiff had pressure ulcers on both of her heels, multiple open areas on the skin of her lower extremities, and a wound on the back of

---

[1]All dates referred to herein pertain to the year 2008.

her left thigh. A wound management team consult was ordered to examine the ulcer on plaintiff's left foot, which had previously been treated with a "wound vac." Nurse Mary Merrill examined plaintiff on January 17 and noted that she would return with Dr. Gordillo, a plastic surgeon, the following day. Plaintiff was then classified as a wound management team patient.

{¶4} When plaintiff's respiratory status worsened, she was intubated and moved to the Intensive Care Unit (ICU). Plaintiff was sedated, placed on a feeding tube and a ventilator, and underwent intensive respiratory therapy, which included high levels of supplemental oxygen, Positive End Expiratory Pressure (PEEP), and treatment with nitric oxide. Plaintiff remained on a ventilator for more than two weeks. On February 4, plaintiff was extubated but remained on oxygen therapy with a breathing mask; on February 9, she was moved from the ICU to the step-down unit; and on February 13, she was discharged to the Broadview Nursing Care Facility, where she was diagnosed with a Stage IV pressure ulcer on her left hip/buttock/ischium area.

{¶5} Plaintiff's claim of negligence relates exclusively to the skin wound on her left hip/buttock/ischium area. Plaintiff contends that the wound originated as a pressure ulcer and that the care she received from defendant's staff fell below the accepted standard of care when they failed to consistently provide the care necessary to prevent or reduce skin breakdown, including repositioning or turning her every two hours. Defendant asserts that its nursing staff met the standard of care and that plaintiff's skin wound was unavoidable.

{¶6} "There is no presumption of malpractice from the mere fact of injury." *Turner v. Children's Hosp., Inc.* (1991), 76 Ohio App.3d 541, 548, citing *Ault v. Hall* (1928), 119 Ohio St. 422, 429. "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to

do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, paragraph one of the syllabus.

{¶7} Plaintiff's expert, Ilene Warner-Maron, Ph.D., R.N., testified that she is certified in both wound care and bariatric nursing, and that she currently practices with Alden Geriatric Consultants, Inc., where she provides expertise in the field of administration and nursing interventions to patients in home health care, nursing homes and the geriatric community.

{¶8} Warner-Maron stated that a pressure ulcer is an area of skin destruction caused by pressure over a bony area, whereby the blood flow is interrupted and the skin dies. She noted that the Braden Scale sets forth the following six factors to consider in assessing a patient's risk for developing pressure ulcers: 1) sensory perception, or ability to respond to pressure-related discomfort; 2) the degree to which skin is exposed to moisture; 3) patient's physical activity level; 4) patient's ability to change and control body position; 5) nutritional status; and 6) effect of friction and shear as a potential problem. Warner-Maron testified that there are four stages of pressure ulcers: Stage I is a red area that does not "blanch" when pressed; Stage II is a superficial tear in either the dermis or the epidermis which can also include a fluid-filled blister; Stage III is a shallow crater through the subcutaneous layer of skin; and Stage IV is significant tissue destruction through the fascia or muscle, which may include bone exposure. Warner-Maron defined a skin tear as a superficial tear to the upper layers of skin.

{¶9} Warner-Maron testified that the medical records reflect that a wound on plaintiff's left posterior thigh existed on January 17, but that there was no documentation of a skin tear in that area until 11 days later. In the step-down unit, beginning on February 9, a large skin tear is noted daily from February 9 to February 12, which at times is described as a Stage II ulcer. Warner-Maron stated that in her opinion, the initial Braden Scale assessment identified that plaintiff was at high risk for pressure ulcers, but that defendant's nursing staff did not implement the appropriate interventions. Warner-Maron further stated that the use of a bariatric bed was appropriate, but questioned whether an adequate support surface was provided. Warner-Maron also opined that the standard of care required turning and repositioning

plaintiff every two hours. Warner-Maron stated that inasmuch as the repositioning of plaintiff occurred every 2 to 4 hours, defendant's employees failed to meet the standard of care. Warner-Maron found no evidence that the wound specialist knew about plaintiff's ischial wound because she was consulted solely for the foot wounds; that weekly measurements of the wound, including descriptions and staging, were not charted; and that if necrotic material existed inside the wound, treatment with Xenaderm, an ointment, would not have been appropriate. Warner-Maron also opined that the wound was a pressure ulcer because it originated over a bony area, the ischium. According to Warner-Maron, the wound was erroneously categorized as a skin tear when, in fact, it originated as a Stage II pressure ulcer that developed into a severe pressure ulcer with necrotic tissue. On cross-examination, Warner-Maron stated that skin tears can occur in the absence of negligence, and that Xenaderm was an appropriate treatment for skin tears.

{¶10} Mary Merrill, R.N., testified that she was a member of defendant's wound management team which consists of certified wound, ostomy, and continence nurses who work in collaboration with a plastic surgeon. Merrill testified that the standard protocol for pressure ulcers is to keep skin clean and dry, to turn and reposition the patient frequently, to provide pressure relief with a low air loss bed, and to maximize nutrition. Merrill added that linens are changed, at a minimum, daily, but many times linens are also changed every time that a patient is turned. Merrill noted that she was aware of plaintiff's ischial wound because the medical records show that she ordered Xenaderm to be applied to the skin around that wound as well as to the wounds on plaintiff's feet.

{¶11} Leandra Towns, R.N., Emily Mowry (nee Jones), R.N., Dusty Kellar, R.N., and Alicia Rendon, R.N., testified that they cared for plaintiff at various times during her stay at defendant's hospital, and that the nursing notes reflect the care that they provided her during that time, including Braden Scale assessments, repositioning, pressure relief aided by the use of a specialty bed, and treatment of plaintiff's wounds. They agreed that due to plaintiff's weight, the assistance of at least four people was required to physically turn her.

{¶12} Leroy Essig, M.D., testified that he was plaintiff's primary physician in the ICU. Dr. Essig explained that while turning is an important part of helping to prevent pressure ulcers, in plaintiff's case, there were some limitations to turning her. Dr. Essig noted that any time patients on a ventilator are turned, there is a risk that they can lose hardware such as central lines or breathing tubes, which can be life-threatening. Dr. Essig further stated that patients with nasogastric tubes who are at risk for ventilator-associated pneumonia are kept in a semi-upright position to prevent aspiration or further ventilator-associated pneumonia, which can also limit turning.

{¶13} Defendant's expert, Diane Krasner, Ph.D., R.N., testified that she is licensed in Maryland and Pennsylvania, and that she has practiced wound/ostomy/continence nursing since 1985. According to Krasner, by definition, skin tears usually occur on legs, shins, hands, and arms, while pressure ulcers occur over a bony prominence. The causes of skin tears are a thinning of the skin, including saggy skin, and a moist environment. She added that the friction of turning someone can also cause a skin tear. Krasner noted that severe edema and incontinence also heighten the risk for skin breakdown; that any acute wound can progress to a chronic wound; and that she has observed skin tears that evolve into pressure ulcers.

{¶14} Krasner stated that inasmuch as plaintiff was immobile, morbidly obese, edematous, and incontinent with leakage of stool, she was at high risk for skin breakdown. After a review of the medical records and the depositions of the treating nurses, Krasner opined that the initial wound, as described in the records, originated as a skin tear, and that the appropriate treatment for such a wound was to keep it moist, since it occurred over a fleshy part of the body and not over a bony prominence. Krasner stated that the ischial wound was most likely a buttocks injury caused by plaintiff's own weight. Krasner opined that defendant's policy of turning a patient every 2 to 4 hours while on a specialty bed (Plaintiff's Exhibit 3) was based upon 2003 guidelines and was reasonable. In sum, Krasner opined that the skin tear was unavoidable, because despite the fact that defendant's nursing staff implemented appropriate interventions including pressure relief, the use of a bariatric bed, incontinence management, skin care, and repositioning, plaintiff's co-morbidities, including her respiratory status and obesity, hindered improvement of the ischial wound.

{¶15} As with virtually all cases involving claims of medical malpractice, this case is based upon the testimony and professional opinions of medical experts. It is not unusual for experts in the medical field to disagree on the standard of care in a particular medical presentation, or whether that standard of care was met. Sincere disagreement as to whether medical treatment met the standard of care in a particular case is understandable. To prevail, plaintiff's evidence must preponderate; that is, plaintiff must demonstrate that it is more likely than not that defendant committed medical malpractice. Thus, the question in this case is whether the evidence and testimony of expert witnesses presented by plaintiff is more persuasive or of greater probative value than the evidence and testimony presented against it. Upon review, the court cannot say that plaintiff's evidence was more persuasive, or of greater probative value than the evidence opposed to it.

{¶16} The court finds that the testimony of Nurse Krasner was more persuasive than that of Nurse Warner-Maron. Indeed, the medical records reflect that plaintiff's injury was repeatedly classified as a skin tear, and that the appropriate treatment for skin tears was implemented. The court finds that plaintiff has failed to prove by a preponderance of the evidence that the standard of care required that she be repositioned every two hours, or that the failure to do so was the proximate cause of plaintiff's ischial wound. The greater weight of the evidence shows that defendant's nursing staff met all applicable standards of care in the treatment of plaintiff and that despite the efforts to minimize skin breakdown, plaintiff's ischial wound worsened.

{¶17} For the foregoing reasons, the court finds that plaintiff has failed to prove any of her claims by a preponderance of the evidence and, accordingly, judgment shall be rendered in favor of defendant.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JOYCE TRIPLETT,                                   Case No. 2009-03991

     Plaintiff,

     v.                                          Judge Alan C. Travis

THE OHIO STATE UNIVERSITY
  MEDICAL CENTER,

     Defendant.                                   JUDGMENT ENTRY


{¶18} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.


_____
ALAN C. TRAVIS
Judge


cc:

Daniel N. Abraham                    Jennifer A. Adair
David I. Shroyer                     Karl W. Schedler
536 South High Street                Assistant Attorneys General
Columbus, Ohio 43215                 150 East Gay Street, 18th Floor
                                     Columbus, Ohio 43215-3130


Filed October 6, 2011
To S.C. reporter November 18, 2011